UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARY GAYLE, as Personal Representative
of the Estate of Kevin L. Griffin, Deceased,
and on behalf of the survivors, S.G., a
minor child, K.G., Jr., a minor child, and
N.G., a minor child,

        Plaintiffs,

v.                                       Case No.  8:06-cv-1159-T-24 TGW

PASCO COUNTY SHERIFF'S OFFICE
and SANDRA McKEE-DUDLEY,

        Defendants.

_____/

**ORDER**

      This cause comes before the Court on Defendants' Motions for Summary Judgment

(Doc. No. 50, 51).  Plaintiffs oppose the motions.  (Doc. No. 79).

**I.  Standard of Review**

      Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears

the initial burden of showing the Court, by reference to materials on file, that there are no

genuine issues of material fact that should be decided at trial.  See DA Mortgage, Inc. v. City of

Miami Beach, 486 F.3d 1254, 1265 (11th Cir. 2007).  A moving party discharges its burden on a

motion for summary judgment by showing or pointing out to the Court that there is an absence

of evidence to support the non-moving party's case.  See Denney v. City of Albany, 247 F.3d

1172, 1181 (11th Cir. 2001)(citation omitted).  When a moving party has discharged its burden,

the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial.  See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted).      In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  See Samples on behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion.  See Augusta Iron & Steel Works v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988).  A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

**II.  Background**

Plaintiffs filed suit against Defendants due to the death of Kevin Griffin ("Griffin") on May 15, 2003 while he was being held at the Pasco County Detention Center ("the Detention Center").  Plaintiffs assert wrongful death claims (Counts I and II) and § 1983 claims for failure to provide proper and timely medical treatment due to a deliberate indifference to Griffin's serious medical needs (Counts III and IV) against Pasco County Sheriff's Office ("White"[1]) and Nurse Sandra McKee-Dudley ("McKee-Dudley").

---

[1]Bob White is the Sheriff of Pasco County.

2

On April 7, 2003, Griffin, age 35, was brought to the Detention Center, where he was awaiting sentencing on a federal drug charge to which he had pled guilty.  The Initial Screening Questionnaire that was signed by Griffin when he was brought to the Detention Center indicates that at some point in time, Griffin had high blood pressure and was treated for depression.  (Doc. No. 51, Ex. D).  There was no indication on the Questionnaire that Griffin had leukemia, because he had not been diagnosed with it.

On April 15, 2003, Griffin was seen by Defendant McKee-Dudley, a nurse, due to his complaint that his chest was hurting.  (Doc. No. 51, Ex. I).  When asked about the pain, Griffin told her that his stomach and chest hurt because he gave his food tray away.  (Doc. No. 51, Ex. I).  When asked why he gave his tray away, Griffin responded that he did so because he does not eat pork.  (Doc. No. 51, Ex. I).  He informed her that he had not eaten pork in ten years and that it began as a religious preference.  (Doc. No. 51, Ex. I).  In response, McKee-Dudley informed Griffin that since his aversion was not a medical issue, she could not help him.[2]  (Doc. No. 51, Ex. I).

On April 19, 2003, Griffin was given a medical screening by Nurse Frawley, and she indicated her findings and Griffin's responses on a Health Appraisal form.  (Doc. No. 56).

---

[2]There is a standing order at the Detention Center regarding what to do when an inmate complains of chest pain.  The standing order provides that the inmate should be given nitroglycerin and a doctor should be called.  Plaintiffs point out that McKee-Dudley did not follow these aspects of the standing order.  While Plaintiffs are correct that McKee-Dudley did not comply with the standing order regarding what to do when an inmate complains of chest pain, Griffin told her that his pain was due to his giving his food tray away due to his aversion to pork.  Plaintiffs cannot argue that giving Griffin nitroglycerin and calling a doctor would have been an appropriate response to a food aversion.  Furthermore, Plaintiffs have not submitted any evidence that giving Griffin nitroglycerin and/or calling a doctor would have made a difference to the outcome of this case.

Griffin told Frawley that he had chronic back pain, right knee pain, and leg pain.  (Doc. No. 56).

Griffin denied having any open sores or lesions.  (Doc. No. 56).  Griffin said that his last dental

exam was five years ago and that he was not having any problems with his teeth or gums.  (Doc.

No. 56).  The Health History Report that was also completed on April 19, 2003 indicates that

Griffin never had severe tooth or gum trouble, pain or pressure in his heart, blood in his urine,

epilepsy or seizure, or frequent or severe headaches.  (Doc. No. 79, Ex. A).

On May 4, 2003, Griffin filled out a Medical Request Form indicating that he was having

migraine headaches and pain in his testicles.  (Doc.  No. 51, Ex. M).  Griffin indicated on the

form that he needed to see a doctor before the pain got worse and that he had been taking aspirin,

but it was not helping the pain.  (Doc. No. 51, Ex. M).

On May 5, 2003, Nurse Hermann Hofmann responded to the medical request.  Hofmann

took Griffin's vital signs, which were typical for most inmates.  (Doc. No. 58).  After an overall

review of Griffin, Hofmann noted that Griffin was complaining of having headaches every

morning, that Griffin's tonsils were reddened and enlarged, and that Griffin's left perineal area

was tender.  (Doc. No. 58).  Griffin told Hofmann that his testicles were not bothering him.

(Doc. No. 58).

Griffin also told Hofmann that when he was arrested he had a urinary tract infection

("UTI") and that he was not treated for it.  (Doc. No. 58).  In response, Hofmann collected and

tested a urine sample.  (Doc. No. 58).  The urine test results showed trace leukocytes (white

blood cells), which meant that he may have had some type of infection.  (Doc. No. 58).  Griffin

also had traces of protein in his urine, which was also indicative of an infection.  (Doc. No. 58).

Griffin also had blood in his urine.  (Doc. No. 58).  Given the presence of leukocytes, protein,

and blood in Griffin's urine, Hofmann thought that Griffin had a UTI, which Hofmann states is not a serious medical condition that would have required that Griffin be sent to the emergency room.  (Doc. No. 58).

Given the presence of leukocytes, protein, and blood in Griffin's urine, Hofmann took another urine sample so that it could be tested to determine what type of infection Griffin had, if any.[3]  (Doc. No. 58).  Hofmann gave Griffin a double-strength antibiotic, which Hofmann contends is the standard dose for a UTI.  (Doc. No. 58).

On May 5, 2003, Griffin submitted two Medical Request Forms.  In the first one, Griffin indicated that his arm and hand were in a lot of pain and that he needed a muscle relaxer.  (Doc. No. 51, Ex. N).  In the second one, Griffin indicated that he was still in a lot of pain and that he needed someone to do something.  (Doc. No. 79, Ex. A).  Nurse Leachman saw Griffin on May 7, 2003, and Griffin complained of left arm pain and that he had no feeling in his fingers.  (Doc. No. 61).  Griffin said that he fell coming out of the shower and that he thought that he had suffered a fracture.  (Doc. No. 61).  In response, Leachman ordered an x-ray of Griffin's left arm, and it came back negative.  (Doc. No. 61).  Leachman advised Griffin to rest his arm.  (Doc. No. 61).

On May 11, 2003, Griffin was seen by Nurse DeKaney during the passing out of medicines in the general population.  (Doc. No. 67).  Griffin told her that his gums were bleeding and that he had bumps on his head and knee.  (Doc. No. 67).  Griffin had a small bump on the right lower side of the back of his head and on his left knee.  (Doc. No. 67).  Griffin also had bright red blood between his teeth and gums, which he said he believed was caused by an

---

[3]The second urine test results came back negative.  (Doc. No. 58).

antibiotic that he was taking. (Doc. No. 67). Griffin also told her that he had some numbness that he believed was due to a reaction from the antibiotic. (Doc. No. 67). DeKaney discontinued Griffin's antibiotic and ordered water/peroxide swishes for Griffin's bleeding gums. (Doc. No. 67). DeKaney states that bleeding gums are very common among inmates and that she did not believe that Griffin was suffering from a serious condition. (Doc. No. 67).

Griffin complained to DeKaney that he was not getting proper medical treatment and asked to be transferred "back." (Doc. No. 67). DeKaney told Griffin that his x-ray results and urine culture were both negative and that she would refer him to the next clinic for evaluation. (Doc. No. 67).

On May 12, 2003, Griffin was seen by Nurse McKee-Dudley. (Doc. No. 51, Ex. I). Griffin complained to her about his bleeding gums and the treatment he was receiving. (Doc. No. 51, Ex. I). McKee-Dudley told Griffin that if he was unhappy with the treatment that he was receiving, he could see an outside provider at his own expense. (Doc. No. 51, Ex. I). Also on May 12, 2003, Griffin submitted a Request for Administrative Remedy, in which he stated that his mouth had been bleeding for three days and that "no one will do anything for [him]."[4] (Doc. No. 51, Ex. O).

Griffin's medical chart indicates that on May 13, 2003, Nurse Ann Clark, ANRP reviewed the chart and questioned whether Griffin actually had blood in his urine. (Doc. No. 51, Ex. 1). The chart further indicates that Clark ordered a recheck of Griffin's urinalysis. (Doc. No. 51. Ex. I). Additionally, the chart indicates that Clark ordered that Griffin continue the

---

[4]It is unclear as to whether Nurse McKee-Dudley saw Griffin before or after he submitted his Request for Administrative Remedy.

water/peroxide swishes.  (Doc. No. 51, Ex. I).

Later that day, May 13, 2003, at approximately 5:50 p.m., a deputy called Nurse Hofmann and said that Griffin was complaining of chest pain.  (Doc. No. 58).  Hofmann instructed the deputy to bring Griffin to the medical wing.  (Doc. No. 58).  Hofmann checked Griffin's vital signs, and Hofmann states that Griffin's vital signs did not indicate a serious medical emergency.  (Doc. No. 58).

Griffin stated that he was experiencing discomfort on the left side of his chest since the previous day.  (Doc. No. 51, Ex. I).  Hofmann gave Griffin an EKG test and noted in the chart that the EKG test printout indicated a sinus tachycardia and nonspecific T-wave abnormality and that the EKG was abnormal.  (Doc. No. 58; Doc. No. 51, Ex. I).  Hofmann did a second EKG test, and it gave the same result.  (Doc. No. 58).  Hofmann ordered that Griffin be housed in the medical wing for further medical review and that he be seen by the doctor.  (Doc. No. 58).  Hofmann gave Griffin two doses of nitroglycerin, after which Griffin indicated to Hofmann that his discomfort was easing.  (Doc. No. 58).

There is a standing order at the Detention Center that advises that if an inmate experiences a "[s]udden onset of severe stabbing pain (pain with each breath or cough) plus tachycardia and hemoptsysis[, it] may indicate a pulmonary embolus and [the] inmate must be sent to [the] E.R. for evaluation."  (Doc. No. 62).  Plaintiffs contend that Hofmann did not follow this standing order, because Griffin was not sent to the emergency room for evaluation. Plaintiffs, however, have not pointed to any evidence that Griffin was complaining of a sudden onset of severe stabbing pain or that Griffin had hemoptsysis.

Hofmann states that he did not believe that the abnormal EKG reading was a medical

emergency.  (Doc. No. 62).  Additionally, Hofmann states that since the nitroglycerin was easing

Griffin's discomfort, Hofmann believed at that time that there was no reason to send Griffin to a

hospital.  (Doc. No. 58).

Griffin's medical chart indicates that on May 14, 2003 at approximately 1:10 p.m.,

McKee-Dudley went to Griffin's cell after receiving a report that an inmate was down and

needed a nurse.  (Doc. No. 51, Ex. I).  The chart further indicates that Griffin was found lying on

the floor of his cell and was semi-alert.  (Doc. No. 51, Ex. I).  Griffin roused to painful stimulus

and to his name, but he was groggy and had loud breathing.  (Doc. No. 51, Ex. I).  No injuries

were detected, and Griffin was not having any seizure activity when McKee-Dudley arrived.

(Doc. No. 51, Ex. I).  However, McKee-Dudley noted that Griffin was incontinent of urine.

(Doc. No. 51, Ex. I).  The chart indicates that Griffin was placed on a mat on the floor with

instructions that the deputy observe Griffin closely.  (Doc. No. 51, Ex. I; McKee-Dudley depo, p.

43-44).

There is a standing order at the Detention Center regarding seizures.  The standing order

provides that the care-giver remain calm and stay with the person during the seizure.  (Doc. No.

62).  The standing order further provides that after the convulsions have stopped, the person will

relax and be unresponsive and that the care-giver should check on the person frequently until a

state of responsiveness and alertness returns.  (Doc. No. 62).  Additionally, the standing order

provides that the care-giver should notify the doctor and supervisor of the situation.  (Doc. No.

62).  The standing order further provides that if the seizure lasts more than three minutes, the

care-giver should get emergency help.  (Doc. No. 62).

Plaintiffs contend that McKee-Dudley did not comply with these aspects of the standing

order.  McKee-Dudley did not personally check on Griffin after the incident to ensure that a state of responsiveness and alertness returned.  (McKee-Dudley depo, p. 44, 48-49).  Additionally, she did not ask the deputy how long the initial seizure lasted, and as such, she did not determine whether the seizure lasted more than three minutes.  (McKee-Dudley depo, p. 44-45).  McKee-Dudley also did not notify a doctor or a supervisor of the incident.  (McKee-Dudley depo, p. 45, 49).

Furthermore, Plaintiffs contend that Griffin was not checked on frequently by anyone until a state of responsiveness and alertness returned.  Additionally, Plaintiffs point out that twenty minutes after the incident, a deputy noted that Griffin was still unresponsive.  (Doc. No. 79, Ex. F).

Later that day, at approximately 5:00 p.m., Nurse Leachman was checking on another inmate and heard a sound and inquired of the deputy what it was.  (Doc. No. 51, Ex. S).  The deputy thought the sound was Griffin snoring.  (Doc. No. 51, Ex. S).  Leachman believed that the sound was not normal, and she went into Griffin's cell.  (Doc. No. 51, Ex. S).  Griffin appeared unresponsive, he had urinated on himself, and he was drooling bloody mucus out of his mouth. (Doc. No. 51, Ex. S; Doc. No. 66).  Leachman said that Griffin appeared to be post-seizure. (Doc. No. 51, Ex. S).  Griffin was having short periods of apnea, which means that he stopped breathing for two to three seconds.  (Doc. No. 66).  Leachman called for another nurse, and Nurses Twomey and McKee-Dudley arrived to help Leachman at approximately 5:10 p.m. (Doc. No. 51, Ex. S)  The nurses took Griffin's vital signs, and McKee-Dudley asked a deputy to call 911 and get EMS.  (Doc. No. 51, Ex. S).

EMS arrived and Griffin was taken to Springhill Regional Hospital and then Bayflited to

Tampa General Hospital.  Griffin was pronounced dead at 1:44 a.m. the next day, May 15, 2003.

Upon autopsy, the Hillsborough County Medical Examiner determined that the cause of Griffin's

death was intracerebral hemorrhage due to hypertensive cardiovascular disease and that a

contributory cause of death was acute myelogenous leukemia.  (Doc. No. 51, Ex. T).

## III.  Motions for Summary Judgment Regarding Section 1983 Claims

Plaintiffs assert § 1983 claims against Sheriff White and Nurse McKee-Dudley based on

the alleged deliberate indifference to Griffin's serious medical needs.  The Court notes that every

claim that a prisoner has not received adequate medical treatment is not a constitutional violation

that supports a § 1983 claim.  See Estelle v. Gamble, 429 U.S. 97, 105 (1976).  An inadvertent

failure to provide adequate medical care, such as negligence in diagnosing or treating a medical

condition, cannot support a § 1983 claim.  See id. at 105-06.  "Medical malpractice does not

become a constitutional violation merely because the victim is a prisoner."  Id. at 106.  Instead,

in order to state a § 1983 claim regarding a prisoner's medical needs, "a prisoner must allege acts

or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."

Id.

"[D]eliberate indifference has three components: (1) subjective knowledge of a risk of

serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."

McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999).  In order to find that a prison official

had the subjective awareness required in order to impose § 1983 liability, a plaintiff must show

two things: (1) that the official was aware of facts from which the inference could be drawn that

a substantial risk of serious harm existed, and (2) that the official drew the inference.  See

Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005)(citation omitted).

In <u>McElligott v. Foley</u>, the court described the types of conduct that could constitute

deliberate indifference:

> [A]n official acts with deliberate indifference when he or she knows that an
> inmate is in serious need of medical care, but he fails or refuses to obtain medical
> treatment for the inmate.  Even where medical care is ultimately provided, a
> prison official may nonetheless act with deliberate indifference by delaying the
> treatment of serious medical needs, even for a period of hours, though the reason
> for the delay and the nature of the medical need is relevant in determining what
> type of delay is constitutionally intolerable. . . . [D]eliberate indifference may be
> established by a showing of grossly inadequate care as well as by a decision to
> take an easier but less efficacious course of treatment.  Moreover, [w]hen the need
> for treatment is obvious, medical care which is so cursory as to amount to no
> treatment at all may amount to deliberate indifference.

<u>McElligott</u>, 182 F.3d at 1255 (internal citations and quotation marks omitted).

Furthermore, in <u>Howell v. Evans</u>, the court explained the standard for deliberate

indifference:

> [T]he standard for deliberate indifference focuses on the failure to provide or
> allow proper treatment in the face of information which reasonably should compel
> action.  Such deliberate indifference is often manifest by a refusal to act when
> certain actions were or should have been known to be necessary, rather than
> simply a failure to act.  In some cases, however, if an official knows or should
> know that certain treatment is necessary, and he delays in providing such
> treatment when he reasonably should know that such delay can be hazardous, his
> actions could constitute deliberate indifference.

<u>Howell v. Evans</u>, 922 F.2d 712, 720 (11th Cir. 1991)[5].  The Court notes that opinions of the

medical profession "are highly relevant in determining what constitutes deliberate indifference in

medical care." <u>Id.</u> at 719 (citations omitted).

Both Defendants White and McKee-Dudley move for summary judgment on Plaintiffs' §

---

[5]<u>Howell v. Evans</u>, 922 F.2d 712, 720 (11th Cir. 1991), <u>vacated</u>, 931 F.2d 711 (11th Cir. 1991), <u>reinstated by unpublished order</u> (June 24, 1991), <u>cited in Howell v. Burden</u>, 12 F.3d 190, 191 n. * (11th Cir. 1994).

1983 claims.  Accordingly, the Court will address each motion.

## A.  Sheriff White's Motion for Summary Judgment

Plaintiffs appear to advance two theories of § 1983 liability with respect to Defendant White: (1) that the medical staff at the Detention Center failed to diagnose Griffin's underlying leukemia prior to May 14, 2003; and (2) that when Griffin had his initial seizure at 1:00 p.m. on May 14, 2003, he was not sent to the hospital in a timely manner.  There is no evidence before the Court that the Detention Center was deliberately indifferent to Griffin's serious medical needs by failing to diagnose Griffin's underlying leukemia.  Plaintiffs have not put forth any evidence that anyone was actually, subjectively aware that Griffin was suffering from leukemia and was at risk for serious harm.  Furthermore, the affidavits of Defendant White's experts show that Griffin was not exhibiting enough symptoms for the medical staff to diagnose him with leukemia.

For example, Dr. Smyth opined the following:

> It is my opinion that Mr. Griffin was not exhibiting sufficient signs or symptoms of myelgenous leukemia such that the medical care providers at the Pasco County Detention Center should have had him evaluated for leukemia. Mr. Griffin's condition was <u>acute</u> in onset. There was no antecedent fever, evidence of bleeding, nausea or vomiting, skin color changes (petechiae, ecchymosis) or evidence of anemia. His leukemia was undiagnosable while he was at the Detention Center.

(Doc. No. 59).  Additionally, Dr. Sperry opined the following:

> From my review of the medical records from the Pasco County Detention Center, and retrospectively knowing that Kevin Griffin had [acute myelogenous leukemia], the only sign or symptoms that he exhibited prior to May 14, 2003, was his complaint of bleeding of the gums. However, this symptom is, in and of itself, not specific nor diagnostic of [acute myelogenous leukemia] or any other disorder that would cause easy bleeding, and the absence of other physical findings as noted in the medical records would have led a reasonable and prudent nurse and/or physician to conclude that the small of amount of bleeding that was

12

observed was not a finding that should have prompted immediate further
investigation.

(Doc. No. 68).

Plaintiffs have not offered any expert witness testimony in this case.  As such, the Court

finds that Defendant White has shown that there is no genuine issue of material fact as to

Plaintiffs' claim that the Detention Center was deliberately indifferent to Griffin's serious

medical needs by failing to diagnose Griffin's underlying leukemia.  Therefore, to the extent that

Plaintiffs' § 1983 claim is based on the failure to diagnose Griffin's leukemia, Defendant

White's motion for summary judgment is granted.

As to Plaintiffs' § 1983 claim based on the Detention Center's alleged delay in getting

Griffin to the hospital after his first seizure on May 14, 2003, Defendant White moves for

summary judgment on this claim, arguing that Griffin's constitutional rights were not violated.[6]

For the reasons stated below, the Court finds that White is entitled to summary judgment on

Plaintiffs' § 1983 claim.

Defendant White argues that Griffin's constitutional rights were not violated, because:

(1) the medical staff acted reasonably; (2) McKee-Dudley did not have the subjective impression

that Griffin was in serious danger after his first seizure; (3) at most, McKee-Dudley acted

negligently, which cannot support a § 1983 deliberate indifference claim; and (4) the four hour

delay in getting Griffin to the hospital did not contribute to Griffin's death.  The Court agrees.

---

[6]Defendant White also argues that there is no evidence that a policy, custom, or practice
of the Sheriff caused the alleged constitutional violation.  However, because the Court finds that
Griffin's constitutional rights were not violated, the Court need not address Defendant White's
argument that there is no evidence that a policy, custom, or practice caused the alleged violation.

Defendant White has submitted expert testimony that the medical staff acted reasonably in response to all of Griffin's complaints.  For example, Dr. Smyth opined:

> On May 5, 2003, . . . Mr. Griffin's urine was tested . . . and the results indicated that Mr. Griffin had trace leukocytes, protein and microscopic blood in his urine. The nurse's subjective impression at the time that Mr. Griffin had a non-serious urinary tract infection was reasonable. This was not a serious medical need such that Mr. Griffin should have been transferred to the Emergency Room.  The nurse . . . ordered another urine test and prescribed an antibiotic, which was reasonable and within the standard of care.
>
> *     *     *
>
> On May 13, 2003, the chart indicates that Mr. Griffin complained of chest pain and was given two EKG tests. . . . The T wave abnormality, in and of itself, was non-specific and not indicative of a serious or impending serious medical problem. The T-wave abnormality was not associated with the apparent stroke that Mr. Griffin suffered on May 14, 2003.  The chart indicates that the nurse gave Mr. Griffin two doses of nitroglycerin for the chest discomfort and that Griffin stated subsequently that his chest pain was easing up. The chart appears to indicate that Mr. Griffin was to be kept in the medical area for further medical review. At the time, Mr. Griffin was not suffering from a serious medical condition such that the nurse should have sent him to the Emergency Room. The nurse's responses to Mr. Griffin's chest discomfort were reasonable and within the standard of care.
>
> *     *     *
>
> There is no indication in the chart that the nurse who found Mr. Griffin at 1:10 p.m. on May 14, 2003, notified a doctor or her supervisor. However, the nurse did not act negligently or with deliberate indifference by not calling a doctor or supervisor because at the time she came upon Mr. Griffin, he was not showing any signs or symptoms of seizure activity. It appears that his seizure, if he indeed had one, had passed. The nurse's protective response - placing Mr. Griffin on the floor and leaving instructions that he be observed closely - was reasonable and within the standard of care.
>
> *     *     *
>
> It is further my opinion that the nurses [sic] responses upon finding Mr. Griffin post-seizure on May 14, 2003, around 1:10 p.m., and Mr. Griffin's subsequent transport to the hospital later on that day, were reasonable and within the standard of care under those circumstances.
>
> *     *     *
>
> It is my opinion that the medical care provided to Mr. Griffin at the Pasco County Detention Center was reasonable, appropriate, not negligent, and within the standard of care for health care professionals under those circumstances. None of the health care providers who had contact with Mr. Griffin were deliberately indifferent to his serious medical needs. To the contrary, they were prompt,

diligent and concerned about Mr. Griffin's welfare.

(Doc. No. 59).

Likewise, Dr. Sperry opined the following:

It is my opinion that the events as delineated on May 14, 2003, wherein [Griffin] was found down in his cell at 1310 hours was, in retrospect, the initial manifestation of his intracerbral hemorrhage, caused by the leukemia and complicated by his underlying systemic hypertension, and that even emergency transfer at that time to a hospital at and following 1700 hours was of no consequence, as the process of intracerbral hemorrhage, cerebral edema, and death were inexorable consequences of his underlying extremely advanced leukemia, and that the advanced state of his disease precluded any realistic chance of survival. The findings of the autopsy, and the laboratory studies done at the two hospitals where he was treated, revealed that his leukemia was extremely advanced, with an incredibly high leukemic white cell count, and this also is an extremely poor prognositc [sic] factor. In the unlikely event that his leukemia had been somehow diagnosed a few days prior to his death, it is far more probable than not that he would have died within a few days anyway, due to the advanced state of his leukemia and the inherent difficulties in treating leukemia at such an advanced state.

\*       \*       \*

[I]t is my opinion, to a reasonable degree of medical certainty, that the degree and severity of Mr. Griffin's leukemia was such that his chance of response to treatment had his condition been diagnosed prior to the onset of his cerebral hemorrhage was essentially nil.

(Doc. No. 68).

Additionally, Dr. Ambinder opined the following:

It is very doubtful that the patient would have survived even if he had presented to the hospital a day earlier than the terminal event because it usually take five to seven days after presentation for the hematologist to determine the exact type of leukemia present in the individual and to prepare his body to receive systemic chemotherapy.

\*       \*       \*

However, the patient's presentation with a CNS bleed would have likely further delayed the onset of treatment of acute leukemia because of the cornorbid conditions involved. Even if he had presented to the hospital several days prior to his terminal event, it is my opinion, within a reasonable degree of medical probability, that he would not have survived.

15

(Doc. No. 69).

Plaintiffs have not submitted any expert testimony that refutes the defense experts' opinions that the medical staff at the Detention Center acted reasonably, and thus, were not deliberately indifferent to Griffin's serious medical needs.  Plaintiffs simply argue that the delay in getting Griffin to the hospital after the first seizure evidences the medical staff's deliberate indifference.  As explained below, the Court is not persuaded by this argument.

In order to show that the medical staff was deliberately indifferent to Griffin's need to go to the hospital immediately after the first seizure occurred on May 14, 2003, Plaintiffs must show that McKee-Dudley had the subjective impression that Griffin was in serious danger after the first seizure occurred.

In order to impose § 1983 liability, Plaintiffs must show two things: (1) that McKee-Dudley was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and (2) that she drew the inference.  The Court agrees that Plaintiffs have not raised a genuine issue of material fact regarding either element.

Clearly, prior to the first seizure, there were no facts from which an inference could have been drawn by any of the medical staff that a substantial risk of serious harm existed.  Even after the first seizure occurred, Dr. Smyth opined that "the nurses [sic] responses upon finding Mr. Griffin post-seizure on May 14, 2003, around 1:10 p.m., . . . were reasonable and within the standard of care under those circumstances."  (Doc. No. 59).

Furthermore, even assuming that after the first seizure there were facts that gave rise to the inference that a substantial risk of harm existed, there is no evidence that McKee-Dudley drew that inference.  Instead, McKee-Dudley took protective measures, such as placing Griffin

16

on a mat on the floor and directing that the deputy observe Griffin closely.  The evidence shows

that McKee-Dudley drew the inference that a serious risk of harm existed after the second

seizure, in which McKee-Dudley asked a deputy to call EMS.  (Doc. No. 51, Ex. S).  Given

McKee-Dudley's prompt response after the second seizure and the protective measures taken by

her after the first seizure, there is no reason to assume (and no evidence showing) that after the

first seizure McKee-Dudley believed that there was a substantial risk of harm to Griffin and that

she deliberately disregarded such risk at that time.

Additionally, the Court notes that at most, McKee-Dudley acted negligently in response

to Griffin's first seizure.  However, negligence cannot support a § 1983 deliberate indifference

claim.  See Taylor v. Adams, 221 F.3d 1254, 1259 (11th Cir. 2000)(noting that deliberate

indifference "requires much more than negligence or malpractice").

Plaintiffs point out that McKee-Dudley did not follow the standing order regarding

seizures that was in effect when responding to Griffin's first seizure.  Specifically, McKee-

Dudley did not: (1) personally check on Griffin after the incident until a state of responsiveness

and alertness had returned; (2) ask the deputy how long the initial seizure lasted in order to

determine whether the seizure lasted more than three minutes; or (3) notify a doctor or a

supervisor of the incident.  Additionally, Plaintiffs point out that twenty minutes after the

incident, a deputy noted that Griffin was still unresponsive.[7]

The Court finds that this evidence does not create a genuine issue of material fact.  To

begin with, the Court notes that "failure to follow procedures does not, by itself, rise to the level

---

[7]The Court notes, however, that Plaintiffs do not point to any evidence showing that the
deputy informed any of the medical staff that Griffin was unresponsive.

of deliberate indifference because doing so is at most a form of negligence." <u>Id.</u>

Furthermore, the Court notes that even though McKee-Dudley did not personally stay with or check on Griffin until a state or responsiveness and alertness occurred, Griffin's chart indicates that McKee-Dudley gave instructions that the deputy observe Griffin closely.  As such, the failure of McKee-Dudley to stay with or check on Griffin after the first seizure, at most, amounts to negligence.

Additionally, the Court notes that Dr. Smyth opined that McKee-Dudley's failure to notify a doctor or nurse about the situation after Griffin's first seizure did not amount to negligence or deliberate indifference to Griffin's medical needs.  Specifically, Dr. Smyth stated:

> There is no indication in the chart that the nurse who found Mr. Griffin at 1:10 p.m. on May 14, 2003, notified a doctor or her supervisor. However, the nurse did not act negligently or with deliberate indifference by not calling a doctor or supervisor because at the time she came upon Mr. Griffin, he was not showing any signs or symptoms of seizure activity. It appears that his seizure, if he indeed had one, had passed. The nurse's protective response - placing Mr. Griffin on the floor and leaving instructions that he be observed closely - was reasonable and within the standard of care.

(Doc. No. 59).

Finally, the evidence shows that even if Griffin was transported to a hospital immediately after the first seizure, the result would have been the same–Griffin would still have died.  As such, the alleged delay in transporting Griffin to the hospital after the first seizure did not cause or contribute to his death.

Specifically, Dr. Sperry opined:

> It is my opinion that the events as delineated on May 14, 2003, wherein [Griffin] was found down in his cell at 1310 hours was, in retrospect, the initial manifestation of his intracerbral hemorrhage, caused by the leukemia and complicated by his underlying systemic hypertension, and that even emergency transfer at that time to a hospital at and following 1700 hours was of no

18

consequence, as the process of intracerbral hemorrhage, cerebral edema, and death were inexorable consequences of his underlying extremely advanced leukemia, and that the advanced state of his disease precluded any realistic chance of survival. The findings of the autopsy, and the laboratory studies done at the two hospitals where he was treated, revealed that his leukemia was extremely advanced, with an incredibly high leukemic white cell count, and this also is an extremely poor prognositc [sic] factor. In the unlikely event that his leukemia had been somehow diagnosed a few days prior to his death, it is far more probable than not that he would have died within a few days anyway, due to the advanced state of his leukemia and the inherent difficulties in treating leukemia at such an advanced state.

*     *     *

[I]t is my opinion, to a reasonable degree of medical certainty, that the degree and severity of Mr. Griffin's leukemia was such that his chance of response to treatment had his condition been diagnosed prior to the onset of his cerebral hemorrhage was essentially nil.

(Doc. No. 68).  Likewise, Dr. Ambinder opined, "Even if [Griffin] had presented to the hospital several days prior to his terminal event, it is my opinion, within a reasonable degree of medical probability, that he would not have survived."  (Doc. No. 69).

Again, as noted above, Plaintiffs have not submitted any expert opinions to contradict the opinions of the defense experts.  As such, summary judgment is warranted, because when a plaintiff claims that medical treatment has been impermissibly delayed, the plaintiff must put "verifying medical evidence in the record to establish the detrimental effect of [the] delay." Surber v. Dixie County Jail, 206 Fed. Appx. 931, 933 (11th Cir. 2006)(citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994), abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730 (2002)); Williams v. South Fulton Regional Jail, 152 Fed. Appx. 862, 864 (11th Cir. 2005).  Since Plaintiffs have failed to submit any medical evidence to support their claim, Plaintiffs have not shown that the alleged delay in transporting Griffin to a hospital after the first seizure caused or contributed to his death.  Therefore, Defendant White is entitled to summary judgment on Plaintiffs' deliberate indifference claim based on the alleged delay.  See

Johnson v. Kats-Kagan, 2007 WL 2176004, at *6 (N.D. Fla. July 25, 2007)(citing Eleventh Cir. Pattern Jury Instr. 2.3.2 (2005)); see also Cook v. Saddiq, 2006 WL 2135670, at *5 (M.D. Ala. Aug. 1, 2006)(citing Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995)(stating that one of the elements of a § 1983 claim of deliberate indifference to a serious medical need is causation).

Accordingly, for the reasons stated above, the Court finds that Defendant White has shown that Griffin's constitutional rights were not violated, because the evidence shows that the medical staff of the Detention Center was not deliberately indifferent to Griffin's medical needs. As such, Defendant White is entitled to summary judgment on Plaintiffs' § 1983 deliberate indifference claim.

### B.  Nurse McKee-Dudley's Motion for Summary Judgment

Nurse McKee-Dudley moves for summary judgment on Plaintiffs' § 1983 claim based on qualified immunity.  The Court finds that her motion must be granted.

The first step in determining whether qualified immunity exists consists of determining whether McKee-Dudley's acts violated Griffin's constitutional rights.  See Freeman v. Town of Eatonville, Fl., 225 Fed. Appx. 775, 779 (11th Cir. 2006).  If the Court concludes that Griffin's constitutional rights have not been violated, the inquiry ends and McKee-Dudley is granted summary judgment.  See id.

The Court has already reviewed McKee-Dudley's actions when ruling on Defendant White's motion for summary judgment and found that Griffin's constitutional rights were not violated.  As such, the Court grants McKee-Dudley's motion for summary judgment.

**C.  Remaining State Law Claims**

Pursuant to 28 U.S.C. § 1367(c), since the Court has granted summary judgment on Plaintiffs' § 1983 claims and the only other claims that remain are state law claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims and counterclaim.  As such, the Court declines to consider the motions for summary judgment as to these claims and dismisses the claims without prejudice

**IV.  Conclusion**

Accordingly, it is ORDERED AND ADJUDGED that:

(1)    Defendant White's Motion for Summary Judgment (Doc. No. 51) is **GRANTED** as to Count III.

(2)    Defendant McKee-Dudley's Motion for Summary Judgment (Doc. No. 50) is **GRANTED** as to Count IV.

(3)    Pursuant to 28 U.S.C. § 1367(c), the Court declines to exercise supplemental jurisdiction over the remaining state law claims and counterclaim, and as such, the Court declines to consider the motions for summary judgment as to these claims and dismisses the claims without prejudice.

(4)    The Court **TERMINATES** Defendant/Counter-Plaintiff White's Motion for Summary Judgment on Counterclaim (Doc. No. 57).

(5)    The Clerk is directed to enter judgment in favor of Defendant White (identified as Pasco County Sheriff's Office) on Count III, to enter judgment in favor of McKee-Dudley on Count IV, and to close this case.

**DONE AND ORDERED** at Tampa, Florida, this 10th day of September, 2007.

*Susan C. Bucklew*

SUSAN C. BUCKLEW
United States District Judge

Copies to: Counsel of Record